**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**KNOXVILLE DIVISION**

| | | |
|---|---|---|
| **LUIS RAFAEL RODRIGUEZ ORTIZ,** | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Nos. 3:17-cv-00401** |
| **JEFFERSON COUNTY, TENNESSEE;** | ) | **REEVES/POPLIN** |
| **SGT. EDDIE MAFNAS**, individually and | ) | |
| officially; | ) | |
| **C.O. RYAN PAYNE**, individually; | ) | |
| **C.O. BRIAN SHULTS**, individually; **and** | ) | |
| **C.O. BRANDON WHITE**, individually, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM AND ORDER

In September 2016, Luis Rafael Rodriguez Ortiz ("Rodriguez") was allegedly assaulted by several inmates and correctional officers at various points of his detention in the Jefferson County Detention Center. In September 2017, Rodriguez filed this civil-rights suit against Jefferson County, Tennessee ("Jefferson County"), 8 correctional officers (Eddie Mafnas, Karen Clevenger, Jonathan Bright, Ryan Payne, Chris Ray, Barbara Schuber, Brian Shults, and Brandon White), and 5 fellow detainees (Jesus Fuentes, Henry Guthrie, Matthew Keith, Trustee John Doe No. 1, and Trustee John Doe No. 2). Defendants Jonathan Bright, Karen Clevenger, Eddie Mafnas ("Mafnas"), Ryan Payne ("Payne"), Barbara Schuber, Brian Schults ("Shults"), Brandon White ("White"), and Jefferson County filed a joint motion for summary judgment on March 29, 2019 [D. 72]. Rodriguez responded on April 19, 2019 [D. 77], Defendants replied on April 26, 2019 [D. 79], and the motion became ripe for adjudication. The Court held a case-management conference with the parties on August 13, 2019 and several of the Defendants were dismissed,

either voluntarily by Rodriguez or by the Court. For the reasons that follow, the joint motion for summary judgment will be granted in part and denied in part.

## I. Background

### A. Facts

On the afternoon of September 8, 2019, Rodriguez was walking in the area of Chestnut Hill Road and Public Drive in Dandridge, Tennessee, distraught over the discovery that his wife had been unfaithful. Officer Robbie McMahan ("Officer McMahan") of the Dandridge Police Department responded to a call about an individual walking in the area and encountered Rodriguez on Public Road. Upon arrival, Officer McMahan asked Rodriguez what he was doing and asked if he needed help. Audio from the arrest reflects that, when asked whether he was intent on harming himself, Rodriguez replied, "I don't wanna hurt myself, whatever, but you know, but I need help . . . 'cause I don't wanna hurt myself." Later, Officer McMahan directly asked Rodriguez, "Do you want to hurt yourself?" Rodriguez exasperatedly chuckled and replied "I just wanna die, but I don't know what to do." After receiving Rodriguez's license and checking for warrants, Officer McMahan discovered an outstanding warrant for Rodriguez's arrest in Sevier County for driving on a suspended license. Officer McMahan informed Rodriguez that Rodriguez would need to resolve the issue before a judge, handcuffed Rodriguez, and transported him to the Jefferson County Sheriff's Department around 4:40PM so that he could be held until Sevier County officers could retrieve him.

Rodriguez was placed in Holding Cell 131 ("HC-131") of the Jefferson County Detention Center ("JCDC"). HC-131 is an observation cell equipped with cameras often used to observe suicidal detainees. Rodriguez was detained in the cell with three other detainees, including another Latino detainee, Jesus Fuentes.

A shift change occurred shortly before 5:00PM. At some point, the correctional officers in the new shift began to confuse Rodriguez, who had not been formally booked into the JCDC, with Jesus Fuentes. While in HC-131 after the shift change, Rodriguez claims that a "big and fat" correctional officer offered cigarettes to two inmate trustees if they would "come into [Rodriguez's] cell and beat [him] up." When the lights were turned off, Rodriguez claims that he placed his head inside the sink to protect himself and pleaded with the other inmates not to fight him. Rodriguez asserts that the unidentified inmates then proceeded to sexually assault him by ejaculating and urinating on his head and face while he called for help. A correctional officer walked by and asked if someone was calling for help, and White then entered HC-131 and brought Rodriguez out of the cell and into the booking area.

In the booking area, which is also equipped with cameras, Rodriguez proceeded to yell for the supervisor to inform him of the assault, but the supervisor, Mafnas, told him that he was busy. Rodriguez then pushed a computer monitor off of the booking desk. What happened next is somewhat in dispute. Rodriguez, at different times, states that he was told to either put his hands up or get on the ground and that he immediately complied. White then grabbed Rodriguez's neck and either "threw," "slammed," or "pushed" Rodriguez to the floor, face down, according to Rodriguez's varying accounts. White, Schults, Mafnas, and Correctional Officer Underwood ("Underwood") then restrained Rodriguez on the floor face down until they could secure him with handcuffs. Schults restrained Rodriguez's lower body, White and Underwood restrained his left and right arms respectively, and Mafnas restrained his head and upper-body area. During this incident while the other three officers were working to restrain Rodriguez, Mafnas struck Rodriguez in the ribs several times with his fists. After Rodriguez was handcuffed, he was lifted and placed into a restraint chair.

While in the restraint chair, Rodriguez continued to yell for Mafnas to come and speak with him. Rodriguez claims that Mafnas came into the room, told Rodriguez to "shut up," and proceeded to choke him. The length of time that Rodriguez remained in the chair is unclear. Rodriguez estimated that he was in the restraint chair for "about two hours." Mafnas stated that they tried to bring Rodriguez back into the cell, but he refused, so officers "put him back in the chair until the next shift showed up." This would place Rodriguez in the restraint chair for just under five hours, from 12:05AM until 4:45AM. JCDC restraint chair logs indicate that "Jesus Fuentes," who was actually Rodriguez, was in the restraint chair from 12:05AM until 3:06AM, which is three hours and one minute. During this time in the restraint chair, Rodriguez was not examined by medical personnel, permitted to change clothes, or permitted to shower. Rodriguez claims that he was not given water, but JCDC logs indicate that he requested water around 12:17AM but refused water when it was given.

Rodriguez was released from the restraint chair and brought back to HC-131 around 3:15AM on September 9, 2016. Due to Rodriguez's threats of "still wanting to harm himself," he was placed under watch in HC-131, according to JCDC logs. At 3:40AM, JCDC logs indicate that Mafnas contacted "Mobile Crisis Landon" and placed Rodriguez, misidentified as Jesus Fuentes, on fifteen-minute suicide watch.

Sometime thereafter, Rodriguez attempted to suffocate himself by tying his shirt around his neck. Correctional officers quickly intervened, placed Rodriguez in a green "turtle" suit, and continued to observe him. Another shift change occurred around 4:45AM.

After the shift change, Correctional Officer Darby discovered that Jesus Fuentes and Rodriguez had been mixed up. JCDC logs kept by Correctional Officers Hall and Darby reflect that at 5:45AM and 6:38AM, Rodriguez was seated on a bench in HC-131, rocking back and forth.

At 7:42AM, Rodriguez refused his breakfast, with the exception of milk. By 8:10AM, Rodriguez had consumed his milk and at 9:15AM, Rodriguez was still seated on the bench. At 10:27, the Sevier County Sheriff's Office retrieved Rodriguez and was informed that Rodriguez had been making suicidal threats. Rodriguez stated that he "went back on suicide [watch]" at Sevier County Jail and nurses evaluated him.

While in the Sevier County Jail, Rodriguez reported that he was assaulted in the JCDC by other inmates at the prompting of a correctional officer and placed in a restraint chair after the computer incident. Sevier County officers relayed Rodriguez's report to Jefferson County officers. Sheriff G.W. Bud McCoig ("Sheriff McCoig") was notified of the booking room incident when it happened and reviewed the footage the next morning. Sometime thereafter, Sheriff McCoig demoted Mafnas from the supervisory role "for his handling of the incident" in booking. Sheriff McCoig stated that he demoted Mafnas because he "was not happy" with Defendant Mafnas striking Rodriguez "in the side two or three times . . . before placing him in the chair." After the demotion, Mafnas resigned.

Detective Perry A. Moyers ("Detective Moyers") of the Jefferson County Sheriff's Office was tasked with following up on Rodriguez's complaints in August 2017. Detective Moyers interviewed Rodriguez in the Sevier County Jail and collected a copy of the complaint Rodriguez made in Sevier County. Detective Moyers reported that Rodriguez's account during the interview conflicted with his complaint made in the Sevier County Jail. During the interview, Rodriguez indicated that a guard participated in the sexual assault, which was not part of Rodriguez's complaint from the Sevier County Jail, and that guards had "beaten and bitten" him. Detective Moyers also collected the JCDC incident report, statements from Officers Underwood, White, and Darby, and JCDC logs.

At some point, Rodriguez requested a copy of the video from HC-131 and the booking area, but Sheriff McCoig reported that the video footage had been lost. When a JCDC technician attempted to retrieve the video, he informed Sheriff McCoig that the hard drive "had been bad" because "lightening[sic] had run in our system."

### B. Procedural History

On September 7, 2017, Rodriguez filed this lawsuit against several correctional officers, fellow detainees, and Jefferson County, Tennessee. [D. 1]. Jefferson County answered the complaint on October 9, 2017 [D. 7], which was later amended to include Jonathan Bright, Karen Clevenger (officially and individually), Eddie Mafnas (officially and individually), Ryan Payne, Barbara Schuberg, Brian Shults, and Brandon White on February 20, 2018 [D. 52].

On March 29, 2019, Defendants Jonathan Bright, Karen Clevenger (officially and individually), Eddie Mafnas (officially and individually), Ryan Payne, Barbara Schuberg, Brian Shults, Brandon White, and Jefferson County, Tennessee filed this motion for summary judgment [D. 72] along with several excerpts of deposition testimony from six correctional officers, Detective Moyers, and Officer McMahan. On April 19, 2019, Rodriguez responded, including a "Declaration Report of Jail Operations Expert Jeff Eiser" ("Eiser Report"), several excerpts of deposition testimony from Rodriguez, Sheriff McCoig, Detective Moyers, Officer McMahan, Mafnas, White, and Shults, a collection of JCDC's documented policies, video of Rodriguez's arrest, a "Fact Sheet" of Detective Moyers' investigation, and JCDC logs. On April 26, 2019, Defendants responded.

On August 13, 2019, the Court held a case management conference with the parties. [D. 106]. Pursuant to that conference, Rodriguez voluntarily dismissed Jesus Fuentes, Henry Guthrie, Matthew Keith, John Doe No. 1, and John Doe No. 2 and the Court dismissed Jonathan Bright,

Karen Clevenger, Barbara Schuberg, and Chris Ray. [D. 115]. Consequently, the remaining Defendants are Eddie Mafnas (officially and individually), Ryan Payne, Brian Shults, Brandon White, and Jefferson County, Tennessee, all of whom are participants in the motion before the Court.

## II.        Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2 (1986); *Moore v. Philip Morris Co., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002).

Once the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. *Celotex*, 477 U.S. at 317. To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the

matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

### III. Analysis

Rodriguez brings nine separate counts against Defendants based on various federal and state law bases.

To the extent that Rodriguez maintains any of these claims against Defendant Payne, he has presented no evidence to that end. Instead, the record reflects that Payne was working in the "Annex," a portion of the JCDC compound roughly "a fourth of a mile away from the main jail." Consequently, none of Rodriguez's claims brought against Defendant Payne are supported by evidence and Defendant Payne will be dismissed from this case.

Otherwise, each count will be addressed in turn.

### A. Count 1 - 42 U.S.C. § 1983 – Excessive Force, Cruel & Unusual Punishment and bodily integrity deprivations in violation of the Fourth, Eighth, and Fourteenth Amendments

Section 1983 provides a federal cause of action against state officials for the deprivation of constitutional rights under color of state law. But only certain defendants can be held liable for damages in a § 1983 suit. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also*

*Williams v. Godby*, 732 F. App'x 418, 420 (6th Cir. 2018). The plaintiff bears the ultimate burden of proving that a defendant is *not* entitled to immunity. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

When determining whether a particular defendant is entitled to qualified immunity, the Court must decide (1) whether the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the defendant's alleged misconduct. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The Court may address these prongs in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### 1. Proper Constitutional Basis

When determining whether a constitutional right was violated, the Court "must first ascertain the source of that right." *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002). Rodriguez has alleged violations under the Fourth, Eighth, and Fourteenth Amendments, but "[w]hich amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between." *Id.* (citing *Gravely*, 142 F.3d at 348–49). If the alleged violation occurs during an arrest or other seizure of an otherwise free person, the claim arises under the Fourth Amendment, which requires an objectively reasonable use of force. *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). If the alleged violation occurs when the person is a convicted prisoner, the Eighth Amendment sets the standard, which is violated if the force was applied maliciously and sadistically rather than to maintain or restore order in good faith. *Id.* (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). If the person is somewhere between the two, the standard is set by the more generally applicable Due Process Clause of the Fourteenth Amendment. *Id.*; *see also Richmond v. Huq*, 885 F.3d 928, 938 n. 3 (6th Cir. 2018).

Here, Rodriguez was arrested by an officer of the Dandridge Police Department when the officer discovered an outstanding Sevier County warrant for Rodriguez's arrest. Rodriguez was brought to the Jefferson County Detention Center and remained there until he was collected by Sevier County officers. It was during this time at the Jefferson County Detention Center that Rodriguez's complaints of excessive force arise, bringing the claims under the purview of the Fourteenth Amendment.

An "excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment." *Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472–73 (2015)); *see also Richmond*, 885 F.3d at 938 n. 3. Though the parties may be unclear where Rodriguez's Fourth Amendment rights ebb and Fourteenth Amendment rights flow, the standard for excessive force is the same regardless. *Clay*, 797 F.3d at 369.

Further, Eighth Amendment rights are generally co-extensive with the Due Process Clause of the Fourteenth Amendment. *Richmond*, 885 F.3d at 938 n. 3 (recognizing that *Kingsley*, 135 S. Ct. 2466 (2015), abrogated the subjective intent requirement for Fourteenth Amendment excessive-force claims, but declining to apply the *Kingsley* standard to a pretrial detainee claim of deliberate indifference to a serious medical need). Accordingly, Eighth Amendment prisoner claims and Fourteenth Amendment pretrial detainee claims are analyzed "under the same rubric." *Id.* (quoting *Villegas v. Metro Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)).

Here, as Rodriguez was a pretrial detainee at the time that the claims arose, his claims arise under the Fourteenth Amendment, so all excessive force claims will be analyzed under the co-extensive Fourth Amendment framework and all of his other claims will be analyzed under the co-extensive Eighth Amendment framework.

### 2. Excessive Force

As the shield of qualified immunity has been raised, the Court must address whether a constitutional violation has occurred, and if so, whether that violation was an affront to clearly established law.

When examining whether a use of force was in violation of the Fourth Amendment, a Court must determine whether the use of force was objectively unreasonable. *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 528 (6th Cir. 2018) (citing *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010)). The Supreme Court has detailed non-exclusive "[c]onsiderations" that "may bear on the reasonableness or unreasonableness of the force used" in the pre-trial context: (1) "the relationship between the need for the use of force and the amount of force used"; (2) "the extent of the plaintiff's injury"; (3) "any effort made by the officer to temper or to limit the amount of force"; (4) "the severity of the security problem at issue"; (5) "the threat reasonably perceived by the officer"; and (6) "whether the plaintiff was actively resisting." *Kingsley*, 135 S.Ct. at 2473 (citing *Graham*, 490 U.S. at 396). However, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Hanson*, 736 F. App'x at 530 (quoting *Graham*, 490 U.S. at 396 (internal citation and quotation marks omitted)). Because "'officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation,' the reasonableness of an officer's use of force 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Laury v. Rodriguez*, 659 F. App'x 837, 843 (6th Cir. 2016) (quoting *Graham*, 490 U.S. at 396–97).

When examining whether a use of force offends clearly established law under the Fourth Amendment, the Court should not define the law "at a high level of generality." *White v. Pauly*,

137 S.Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).  Instead, it must be "particularized" to the facts of the case; unless the violation was obvious, a court needs to identify another case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  This specificity is especially important in the Fourth Amendment context, where "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Saucier*, 533 U.S. at 205).  It not contested that a detainee's right to be free from the use of excessive force at the hands of a corrections officer is a clearly established right under the Fourth and Fourteenth Amendments. *See Kingsley*, 135 S. Ct. at 2473; *Hanson*, 736 F. App'x at 528.  However, each alleged use of excessive force must be examined in its particularized context.

Here, Rodriguez has alleged that the use of force against him was excessive in three instances: (1) the takedown after pushing the computer monitor, (2) the force used on the floor after the takedown, and (3) the force used during Rodriguez's time in a restraint chair.  The Court will examine each use of force by each defendant to determine whether the use of force violated the Constitution and, if so, whether the use of force violated clearly established law.

### a. Takedown after pushing the computer monitor

Rodriguez has alleged that, during booking, he repeatedly yelled for then-supervisor Mafnas to inform him of a prior attack by other inmates.  After Mafnas rebuffed Rodriguez's shouts, Rodriguez reached across the booking desk and shoved the computer monitor off of the desk.  At this point, White "put his hand on [Rodriguez's] neck" and either "threw," or "pushed [him] on the ground," according to Rodriguez's varying accounts.  White was then joined by

Mafnas, Shults, and Underwood in restraining and handcuffing Rodriguez. Rodriguez alleges that the takedown or ensuing struggle on the ground "busted his nose."

Here, the facts show that White did not act excessively or was objectively unreasonable when he brought Rodriguez to the floor in the process of restraining him. Though the Court views the facts in the light most favorable to the plaintiff, the plaintiff's account of the takedown is varied. Rodriguez states by affidavit that, after shoving the computer monitor off of the desk, he was told to "put my 'hands up and stay still,'" and that he "immediately obeyed." However, eight months prior during deposition testimony,[1] Rodriguez stated that "[t]hey told me to get on the ground, get on the ground, but I was like this." Rodriguez also states by affidavit that Defendant White "grabbed [him] around his neck and body slammed [him] to the concrete floor." However, eight months prior, Rodriguez stated that "the officer put his hand on my neck and pushed me on the ground." Elsewhere in the prior deposition, Rodriguez stated "I kept screaming louder. And then I pushed the monitor down . . . And then he said, put your hands up in the air . . . And I put my hands up in the air. And he grabbed me by the head and threw me on the ground." Regardless of which Rodriguez account of the takedown the Court adopts, it is clear that Rodriguez escalated his resistance to the booking process and continued to "scream" for Mafnas, despite admonitions to stop. After Rodriguez pushed the monitor in the general direction of correctional officers, White executed the takedown. Active resistance that justifies additional force "can take the form of 'verbal hostility' or 'a deliberate act of defiance.'" *Hanson*, 736 F. App'x at 531 (quoting *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015)). Consequently, when judged from the

---

[1] The Court notes that "a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)).

perspective of a reasonable officer on the scene, White's split-second decision to take down Rodriguez after his escalating defiance became physical was not objectively unreasonable.

Further, even if the takedown was excessive, it did not violate "clearly established law." Undoubtedly, when an officer gratuitously "slams," "bangs," or performs a "takedown" on a suspect who is handcuffed and not a threat to the officer's safety, the officer has acted in an objectively unreasonable manner. *See Adams as Next Friend of K. E. v. Blount Cty., Tenn*., No. 3:17-CV-313, 2019 WL 1233750, at *21 (E.D. Tenn. Mar. 15, 2019) (citing *Phelps*, 286 F.3d at 297); *Burgess v. Fischer*, 735 F.3d 462, 474 (6th Cir. 2013); *Evans v. Plummer*, 687 F. App'x 434, 442 (6th Cir. 2017) (after *Burgess*, "it is beyond debate that performing a takedown on a detainee who is physically compliant, not a threat, and not attempting to flee violates the Fourth Amendment") (quotation marks omitted); *Darnell v. Carver*, 156 F.3d 1229 (Table) (6th Cir. 1998) (upheld denial of qualified immunity where jury could conclude officer intentionally threw plaintiff to ground and "either pushed [plaintiff's] head into the pavement or lifted it and let it drop")). However, unlike in *Adams*, *Burgess*, *Evans*, and *Phelps*, White's takedown of Rodriguez occurred before he was handcuffed or incapacitated and while he was still a threat to the officers' safety. Further, White used tempered force, not deadly force, which, at most, resulted in a bloodied, but not broken, nose. Likewise, as a further distinction, the use of force was predicated on the physical act of defiance.

Consequently, White is entitled to qualified immunity for the takedown. In the peacefulness of a judge's chambers and with the benefit of hindsight, such a takedown may not have been necessary. But qualified immunity operates "to protect officers from the sometimes 'hazy border between excessive and acceptable force.'" *Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174–75 (6th Cir. 2004) (quoting *Saucier*, 533 U.S. at 206). An officer is entitled to

qualified immunity if he made an objectively reasonable mistake as to the amount of force that was necessary under the circumstances with which he was faced. *Greene v. Barber*, 310 F.3d 889, 894 (6th Cir. 2002).

### b. Restraining on the ground

Rodriguez has alleged that, after the takedown "while [White] was holding [him], the other officers came running and pushed [him] on the ground." Though his nose was not broken, "it was busted and Rodriguez was bleeding" because "they were pushing my head on the ground." Rodriguez alleges that he was restrained by four correctional officers—White, Schults, Mafnas, and Underwood (who has never been a party in this suit). Rodriguez asserts that the use of four officers who "outweighed Rodriguez by well over one thousand" pounds was excessive. However, Defendants have presented uncontroverted evidence that all four officers were not placing their full body weight on Rodriguez. Schults worked to restrain Rodriguez's legs and placed his knee on his upper legs. White and Underwood worked to restrain Rodriguez's arms on his left and right, respectively. However, Mafnas "had ahold of his head," eventually electing to strike Rodriguez repeatedly in his back. Each officer's use of force will be addressed.

As for White, the undisputed facts indicate that White did not place the whole of his body weight on Rodriguez and merely attempted to restrain his left arm until Rodriguez could be handcuffed. Regardless of whether Rodriguez was resisting at this point or not, this use of force was not excessive. White is entitled to qualified immunity for his use of force

As for Schults, the undisputed facts indicate that Shults attempted to restrain Rodriguez's legs following the takedown by placing his knee on Rodriguez's upper legs area. Rodriguez has not alleged any injury from this restraint and, once Rodriguez was handcuffed, Defendant Shults

withdrew from Rodriguez.  Regardless of whether Rodriguez was resisting at this point or not, this use of force was not excessive.  Shults is entitled to qualified immunity for his use of force.

As for Mafnas, the alleged use of force is much less reasonable.  Deposition testimony of White and Shults state that Mafnas was holding Rodriguez's head, and Rodriguez has testified that an officer was "pressing on my nose . . . [a]nd it gashed my nose from the concrete."  Further, the facts indicate that Mafnas proceeded to strike Rodriguez's back in the area of his ribs repeatedly.  Granted, "[n]ot every push or shove . . . violates the Fourth Amendment." *Hanson*, 736 F. App'x at 530.  However, Rodriguez was restrained by three other officers at the time, mitigating the need for further force and the threat that Rodriguez posed at that point.  In short, a jury could find that Mafnas "gratuitously applied additional force" against Rodriguez. *See Laury*, 659 F. App'x at 844 (citing *Lustig v. Mondeau*, 211 F. App'x 364, 371 (6th Cir. 2006)).  Though Rodriguez's injuries are relatively slight, a detainee who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury. *Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010).  Likewise, existing law made clear that an officer may not gratuitously use force to inflict pain on an already neutralized or incapacitated detainee. *See, e.g.*, *Lustig*, 211 F. App'x at 371–72; *Phelps*, 286 F.3d at 301; *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994); *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir.1988).  Consequently, Mafnas does not enjoy qualified immunity on his use of force after the takedown and before Rodriguez was placed in the restraint chair, and a jury may more properly determine whether this use of force was excessive.

### c.   Restraint chair

Rodriguez has alleged that the use of the restraint chair for over three hours, in excess of the two-hour limit mandated by Jefferson County Detention Center policy, manifested excessive

force.  In regards to the individual defendants, Rodriguez does not allege any basis to find the use of the restraint chair objectively unreasonable.  Further, though Rodriguez presents evidence that the extended use of the restraint chair may have violated Jefferson County policy, Rodriguez does not show that the extended use of the restraint chair violated clearly established law.  *See Hanson*, 736 F. App'x at 533.  Consequently, qualified immunity bars any excessive force claim arising from this extended use of the restraint chair as against any individual Defendant.  To the extent that Rodriguez alleges that Jefferson County had an unconstitutional policy or practice regarding the restraint chair this fails for the reasons discussed *infra* in the Court's discussion of Count 3.

Nevertheless, Rodriguez also alleges that, while in the restraint chair, he continued to yell.  It is undisputed that Mafnas told Rodriguez to "shut up" in response.  What happened next is disputed.  Rodriguez alleges that Mafnas grabbed Rodriguez around the neck and started to choke him.  Mafnas flatly denies that he choked Rodriguez.  Nevertheless, the Court views the facts in the light most favorable to Rodriguez.  As a result, choking Rodriguez, who was restrained at the wrist, waist, and ankles, could be a gratuitous application of additional force.  *See Laury*, 659 F. App'x at 844 (citing *Lustig*, 211 F. App'x at 371).  Likewise, existing law makes it clear that an officer may not gratuitously use force to inflict pain on an already neutralized or incapacitated detainee. See, e.g., *Lustig*, 211 F. App'x at 371–72; *Phelps*, 286 F.3d at 301; *Adams*, 31 F.3d at 387; *McDowell*, 863 F.2d at 1307.  Consequently, Mafnas' does not enjoy qualified immunity for this particular allegation, and a jury may more properly determine whether the choking occurred while Rodriguez was in the restraint chair and whether the use of force was excessive.

### 3. Cruel and Unusual Punishment

To the extent that Rodriguez brings claims of "cruel and unusual punishment" under the Eighth Amendment for excessive force, those claims fail as a matter of law.  As discussed *supra,*

"excessive force" issues are examined under the Fourth Amendment (by way of the Fourteenth Amendment) when, as here, the plaintiff is a pretrial detainee.

However, Rodriguez appears to also allege Eighth Amendment violations for failure to protect him from other inmates, failure to protect him from other correctional officers, and for deliberate indifference to his medical and physical needs. Again, the Fourteenth Amendment is the proper basis from which to start for pretrial detainees, but the analysis for these claims is the same, as the Eighth Amendment is coextensive in this regard. *See Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018); *Phillips v. Roane Cty.*, 534 F.3d 531, 539 (6th Cir. 2008)).

Each of Rodriguez's remaining Eighth Amendment claims will be addressed.

### a. Failure to Protect from Other Inmates

Under the Eighth Amendment, officials have a duty to protect detainees from violence by other detainees and to take reasonable measures to protect their safety. *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994). The claim has objective and subjective components; a detainee must show that: (1) "the failure to protect from risk of harm is objectively sufficiently serious"; and (2) that "prison officials acted with deliberate indifference to inmate health or safety." *See Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011). In other words, the plaintiff must show that the detainee's health and safety was objectively and substantially at risk, yet, despite awareness of facts giving rise to a substantial risk and drawing an inference of the risk, the officer did nothing. *See id.* at 766–67; *see also Farmer*, 511 U.S. at 834–48 (holding that an official demonstrates deliberate indifference under the Eighth Amendment if he disregards an excessive risk to inmate safety "by failing to take reasonable measures to abate it," but that an officer cannot be held liable if he was unaware of the risk of harm even if the risk was obvious and a reasonable official would have noticed it). "Because government officials do not readily admit the subjective component of

this test, it may be demonstrated in the usual ways, including inference from circumstantial evidence." *Richko v. Wayne Cty., Mich.*, 819 F.3d 907, 916 (6th Cir. 2016) (citing *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009)). The mental state required to establish deliberate indifference is equivalent to criminal recklessness. *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839–40).

Here, Rodriguez alleges that, once in the cell, a "big and fat" correctional officer offered cigarettes to the two trustee inmates if they would "beat [Rodriguez] up." Rodriguez alleges that the trustees, joined by two or three other inmates, then proceeded to ejaculate and urinate on him while he called for help and attempted to shield his face in the sink of the cell. This allegation, if true, is utterly deplorable. But the evidence before the Court is insufficient to sustain the claim against any of the individual Defendants. First, to the extent that Rodriguez alleges that one of the individual Defendants was the instigating officer, Rodriguez has presented no evidence to that end. This unidentified "big and fat" correctional officer is essentially another "John Doe," and Rodriguez has not exercised sufficient due diligence to identify the officer. *See, e.g.*, *Thomas v. Bivens*, No. 3:09-CV-62, 2011 WL 32207, at *7 (E.D. Tenn. Jan. 5, 2011); *Smith v. City of Chattanooga*, No. 1:08-CV-63, 2009 WL 3762961, at *5 (E.D. Tenn. Nov. 4, 2009). Second, to the extent that Rodriguez alleges that the individual Defendants were deliberately indifferent otherwise, Rodriguez has not presented any evidence that any Defendant knew of any plot by officers or inmates to assault Rodriguez or that any Defendant drew an inference that Rodriguez was at risk from the other inmates. Granted, Rodriguez's deposition testimony is that there was "a lady next door just laughing" from the "booking" area during the alleged assault, but that lady is also unidentified and there are no female correctional officers as a party to this case. Further, the record reflects that when a correctional officer heard some sort of disturbance, White brought

Rodriguez out of the cell and into the booking area. Third, to the extent that Rodriguez alleges that Mafnas is liable as a supervisor, there is no evidence that, in instance, Mafnas "abandon[ed] the specific duties of his position . . . in the face of actual knowledge of a breakdown in the proper workings of the department." *Winkler*, 893 F.3d at 898 (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Winkler*, 893 F.3d at 898 (quoting *Farmer*, 511 U.S. at 838).

In short, Rodriguez has failed to present evidence to establish the subjective element necessary for failure-to-protect liability "to make the issue of fact a proper question for the factfinder." *Anderson*, 477 U.S. at 250248 (1986).

### b. Failure to Protect from Other Officers

It is also clearly established that correctional officers have a duty to protect inmates in their custody from violence at the hands of fellow officers. *McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990); *Hunt v. Braden*, 2016 WL 2939542, at *4 n.4 (W.D. Tenn. May 19, 2016) (noting that "a prison guard need not actually take part in an assault to be held liable for failure to protect if he displays deliberate indifference to an excessive risk to an inmate's health or safety"). The objective and subjective components are also present in this failure-to-protect claim.

The "deliberate indifference" required from the subjective component recognizes that, at least constitutionally, "[m]erely being in the presence of an officer who suddenly shoves someone is not the same as standing by idly while a group of officers surrounds and beats someone." *White v. Bell*, 656 F. App'x 745, 749 (6th Cir. 2016). Consequently, an officer is liable for failing to protect a prisoner from excessive force only when the officer "had both the opportunity and the means to prevent the harm from occurring." *Dixon v. Neubacher*, 2015 WL 1476776, at *19 (N.D.

Ohio Mar. 31, 2015) (quoting *Cole v. City of Dearborn*, 448 F. App'x 571, 577 (6th Cir. 2011));

*White*, 656 F. App'x at 749 (noting that "[o]fficers are liable for failing to intervene only when

they at least have some chance of stopping the use of excessive force").

Here, the only excessive-force claims that have survived are those against Mafnas from the

booking incident and the choking incident. The record shows that Shults and White were present

when Mafnas allegedly struck Rodriguez in the back during the booking incident. However, they

were also occupied with restraining Rodriguez at the time up and until the point that he was

handcuffed. Mafnas' sudden escalation of force was not one that either Shults or White had the

opportunity or means to intervene. As for the choking incident, the record is unclear when this

occurred during Rodriguez's time in the restraint chair. Mafnas testified, as did Rodriguez, that

Rodriguez continued to call for Mafnas after being placed in the restraint chair. At some point,

possibly one hour in, Mafnas "came out" and told him to "shut up," which is when the choking

allegedly occurred. However, there is no evidence on the record to support that either Shults or

White were aware of any choking, or had the opportunity or means to stop it. As a result, this

failure-to-protect claim fails as well as to either triable excessive-force allegation.

### c. Deliberate Indifference to Medical Needs

A deprivation alleged under the Eighth Amendment must result in the denial of "the

minimal civilized measure of life's necessities." *Richmond v. Settles*, 450 F. App'x 448, 454–55

(6th Cir. 2011) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The Eighth Amendment

is concerned only with "deprivations of essential food, medical care, or sanitation" or "other

conditions intolerable for prison confinement." *Id.* (citing *Rhodes*, 452 U.S. at 348). Consequently,

"[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel

and unusual punishment within the meaning of the Eighth Amendment." *Id.* (quoting *Ivey v.*

*Wilson*, 832 F.2d 950, 954 (6th Cir. 1987). Like a failure to protect claim, a claim of deliberate indifference to serious medical needs contains objective and subjective components. *Winkler*, 893 F.3d at 890.

For the objective component, the detainee's medical need must be demonstrably and sufficiently serious. *Richmond v. Huq*, 885 F.3d at 938 (6th Cir. 2018) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A medical need is objectively serious if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004). A detainee's "psychological needs may constitute serious medical needs, especially when they result in suicidal tendencies.'" *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)).

Here, the gravamen of this claim rests in Rodriguez's allegation that the Defendants were deliberately indifferent to his suicidal tendencies. Rodriguez attempted suicide once he was returned to HC-131 after his time in the restraint chair, so his psychological medical needs were objectively and sufficiently serious. As for Rodriguez's physical medical needs, the only physical injury alleged by Rodriguez was a "busted nose" that bled, but was not broken. Likewise, Rodriguez does not allege any physical injury from Mafnas' rib strikes or choking or plead any physical injury so extensive and "obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Richmond v. Huq*, 885 F.3d at 938. Consequently, Rodriguez's physical medical needs were not objectively serious, while his psychological medical needs were.

As for the subjective component, the plaintiff must show that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk. *Comstock*, 273 F.3d at 703 (citing

*Farmer*, 511 U.S. at 837). The disregard of the risk is more than negligence; it "is the equivalent of recklessly disregarding that risk." *Farmer*, 511 U.S. at 836.

Here, there is some dispute as to *when* Defendants may have had facts sufficient to infer that Rodriguez was suicidal. Rodriguez claims that he was suicidal at the time that Officer McMahan encountered him on Public Drive, but audio from the arrest captures Rodriguez saying "I don't wanna hurt myself . . . but I need help." Nevertheless, Rodriguez states that Officer McMahan told the receiving correctional officers at the JCDC that Rodriguez was suicidal. While he was placed in an observation cell, no medical intervention was sought upon Rodriguez's arrival or after the shift change. It is clear that Mafnas, as supervisor of the correctional officers, perceived facts that indicated that Rodriguez was suicidal and drew such an inference *after* Rodriguez was removed from the restraint chair. At this point, Rodriguez threatened to harm himself and was placed on a "15-minute suicide watch." At some point thereafter, Mafnas contacted the mobile crisis unit. When Rodriguez attempted to suffocate himself by tying his shirt around his neck, a correctional officer quickly intervened, preventing the attempt from succeeding. After the attempt, Rodriguez claims he was placed in a green "suicide suit" and detention center records indicate that Rodriguez was being observed periodically to ensure no further self-harm occurred. Likewise, when Rodriguez was collected by the Sevier County Sheriff's Officer, the transporting officer was notified that Rodriguez was making suicidal threats.

While Defendants may not have or precisely followed the strictures of JCDC policy, the record reflects that all Defendants, at worst, were merely negligent. From the time of Rodriguez's arrival at the JCDC, he was placed under watch in HC-131, an observational cell. But no medical personnel, such as the mobile crisis unit, was contacted until *after* Rodriguez make explicit threats of self-harm. Viewing the facts in the light most favorable to Rodriguez, Mafnas, as supervisor,

likely should have drawn the inference that Rodriguez was suicidal, but the record does not support that Mafnas drew such a conclusion until much later. Nevertheless, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Winkler*, 893 F.3d 877, 898 (quoting *Farmer*, 511 U.S. at 838).

Further, while no medical personnel ever evaluated or treated Rodriguez while he was at the JCDC, Rodriguez spent only eighteen hours at the JCDC on a temporary hold. Even presuming that the Defendants had sufficient facts to infer that Rodriguez was suicidal from his arrival at the JCDC and drew that inference, he was placed under watch and monitored. When Rodriguez made direct threats of self-harm, medical personnel were contacted. Though medical personnel never evaluated Rodriguez at the JCDC, the Sevier County Sheriff's Office was notified that Rodriguez was suicidal so that he could be properly treated upon arrival at his final destination. An inconsequentially slow or "inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). In short, this claim fails for want of evidence to support any "deliberate indifference" to Rodriguez's mental health needs on the part of any Defendant.

### d. Deliberate Indifference to Physical Needs

Rodriguez also appears to allege that the Defendants were also deliberately indifferent to his physical needs, particularly while in the restraint chair. Namely, Rodriguez takes issue with being placed in the restraint chair beyond the time allowed under JCDC policy and without the requisite monitoring, being denied water while in the restraint chair, and being denied access to a shower or change of clothes after the alleged sexual assault.

As for placement in the restraint chair beyond the two hours permitted in Jefferson County Sheriff's Office Administrative Policy 4.3 and without the requisite monitoring, this claim does not rise to the level of a constitutional violation. Though unclear, the record appears to indicate that Rodriguez was in the restrain chair for approximately three hours. During that time, Rodriguez has stated that various correctional officers passed in and out of the room. The Sixth Circuit has found that similar use of a restraint chair does not rise to a constitutional violation. *See Hanson*, 736 F. App'x at 533 (three hours); *Grinter v. Knight*, 532 F.3d 567, 573–74 (6th Cir. 2008) (four hours). Likewise, the record shows that Rodriguez was offered water, but refused it. Rodriguez has not established that the use of the restraint chair demonstrated any deliberate indifference to his physical needs. No doubt, "[a]ny restraint, no matter how comfortable, is unpleasant, but not all restraint is punitive." *Beyer ex rel. Estate of Beyer v. City of Johnson City, Tennessee*, No. 2:01-CV-45, 2003 WL 23737298, at \*6 (E.D. Tenn. Feb. 24, 2003),

As for the denial of a shower or change of clothes, the Sixth Circuit has held that "deprivation of a shower and other personal hygiene items" for a "brief span of time" even up to six days does not give rise to a constitutional violation. *See Richmond v. Settles*, 450 F. App'x 448, 455 (6th Cir. 2011) (citing *Siller v. Dean*, 205 F.3d 1341 (6th Cir. Feb.1, 2000) (Table)).

In short, Rodriguez has not established that any of the Defendants were deliberately indifferent to his physical needs while he was detained at the JCDC.

### 4. Bodily Integrity

Rodriguez also raises a claim of "bodily integrity deprivation" under the Fourteenth Amendment, presumably arising from the alleged sexual assault by other inmates against Rodriguez. To the extent that Rodriguez raises an alternative Fourteenth Amendment ground for liability, apart from the "failure to protect" claim, the Court construes this as an alternative claim

that Rodriguez's right to bodily integrity, "the 'right to be free from . . . unjustified intrusions on personal security,'" was violated. *Guertin*, 912 F.3d at 918 (quoting *Ingraham*, 430 U.S. at 673–74). The Sixth Circuit has been clear that the Due Process Clause provides for the right to be free from sexual abuse at the hands of a *state* actor. *See Doe v. Magoffin Cty. Fiscal Court*, 174 Fed.Appx. 962, 2006 WL 959812, *4 (6th Cir. Apr.13, 2006); *Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (clearly established right under substantive due process to "personal security" and "bodily integrity" encompasses right not to be sexually assaulted under color of law).

However, Rodriguez alleges that the sexual assault occurred at the hands of inmates, not state actors. Generally, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Pung v. Michigan Dep't of Corr.*, No. 1:13-CV-1031, 2015 WL 1459440, at *4 (W.D. Mich. Mar. 30, 2015) (quoting *DeShaney v. Winnebago Co. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). Nevertheless, there is a limited exception for what is called a "state-created danger" claim. *Id.* (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998)). "Liability under the state-created danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Id.* (citing *Kallstrom*, 136 F.3d at 1066). State actors are liable for breaching their obligation to the plaintiff only if they engaged in conduct that "was so 'egregious' that it can be said to be 'arbitrary in the constitutional sense.'" *Sperle v. Michigan Dep't of Corr.*, 297 F.3d 483, 491 (6th Cir. 2002) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 509, 510 (6th Cir. 2002). This standard lacks precise boundaries, but the Supreme Court "has repeatedly instructed that the Fourteenth Amendment protects only against abuse of executive power which 'shocks the conscience.'" *Id.* (quoting *Ewolski*, 287 F.3d at 510).

Here, Rodriguez does allege that his assault by other inmates was the product of a correctional officer's encouragement for inmates to "beat him up" in exchange for cigarettes. However, as discussed *supra*, Rodriguez has failed to even argue that any of the remaining individual defendants were the correctional officer who gave that order or offer. Absent sufficient evidence, this alternative theory of substantive due process liability fails as well.

### 5. Conclusion

To the extent any portion of Count 1 is brought against Defendant Mafnas in his official capacity, that claim is treated as claim against the municipality, which is discussed *infra*. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978); *see Hafer v. Melo*, 502 U.S. 21, 25 (1991); *see Peatross v. City of Memphis*, 818 F.3d 233, 240–41 (6th Cir. 2016). ("[A]n official-capacity claim against a person is essentially a claim against the municipality."). Likewise, though Count 1 is raised against "all defendants," any potential municipal liability of Jefferson County can only be established through the substance of the claims against Jefferson County in Count 3, which is discussed *infra*.

In sum, the only claims under Count 1 that survive summary judgment are Rodriguez's claims against Defendant Mafnas, individually, for allegedly striking Rodriguez in the ribs while he was being restrained by three other officers and for allegedly choking Rodriguez while he was restrained in the restraint chair. All other claims under Count 1 against all other Defendants fail and will be dismissed.

### B. Count 2 - 42 U.S.C. § 1983 – Racial Discrimination deprivations of the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1981 and 42 U.S.C. § 1985(3)

Rodriguez brings race-based discrimination claims under the Equal Protection Clause of the Fourteenth Amendment by way of 42 U.S.C. § 1983, 42 U.S.C. § 1981, and 42 U.S.C. § 1985. First, the Court will address the claim under §1981 and § 1983, then the Court will turn to § 1985.

### 1. Equal Protection Clause of the Fourteenth Amendment – 42 U.S.C. §§ 1981, 1983

At the outset, the Court notes that Rodriguez's claims of racial discrimination under § 1981 and § 1983 arise from a common basis in the Equal Protection Clause of the Fourteenth Amendment and warrant essentially the same analysis. *See King v. City of Eastpointe*, 86 F. App'x 790, 801 (6th Cir. 2003). To state a claim under § 1981, the plaintiff must allege that he was treated differently because of his race. *Id.* at 800 (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000); *Long v. Ford Motor Co.*, 496 F.2d 500, 504 (6th Cir. 1974)). In order to prove his claim, the plaintiff must establish (1) membership in a racial minority, (2) that the defendant(s) intended to discriminate on the basis of race, and (3) discrimination concerning one of the activities enumerated in § 1981. *Id.* at 801 (citing *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2nd Cir. 2000); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1101 (10th Cir. 2001); *Morris v. Office Max, Inc.*, 89 F.3d 411, 413–14 (7th Cir. 1996)). To establish a valid claim under § 1983, a claimant must show (1) that the conduct complained of was committed by a person acting under color of state law, and (2) that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Id.* (citations omitted). There is no dispute in this case that the corrections officers and Jefferson County were acting under color of state law so this case centers around the latter prong of this test.

Rodriguez alleges that all Defendants violated his right to "be free from racially motivated beatings, violations of his bodily integrity, excessive force, and other federal rights, including against deliberate indifference deprivations of federal rights by state government actors," thereby

casting racial discrimination as a pall over his other claims. Rodriguez, who is Puerto Rican, claims that he was repeatedly called "Sasquatch"[2] by certain inmates and "the jailers," who used the term "[a]bout 10 times, 15 times."

Under the Equal Protection Clause, the use of racially discriminatory language can provide some evidence of a discriminatory purpose when that language is coupled with some additional harassment or constitutional violation. The use of a racial epithet by itself is not an actionable violation of the Equal Protection Clause. *See Owens v. Johnson*, No. 99–2094, 2000 WL 876766, at *2 (6th Cir. June 23, 2000) (unpublished) ("The occasional or sporadic use of racial slurs, although unprofessional and reprehensible, does not rise to a level of constitutional magnitude."); *Williams v. Bramer*, 180 F.3d 699, 706 (5th Cir.1999) ("[A]n officer's use of a racial epithet, without harassment or some other conduct that deprives the victim of established rights, does not amount to an equal protection violation.").

However, "[t]he use of an epithet . . . is strong evidence that a comment or action is racially motivated," *Williams v. Bramer*, 180 F.3d at 706, and evidence of racial slurs may be able to support a § 1983 Equal Protection Clause claim when they accompany some other prohibited behavior. *Id.*; *Simmons v. O'Brien*, 77 F.3d 1093, 1094 n. 2 (8th Cir. 1996); *Smith v. Thornburg*, 136 F.3d 1070, 1089–90 (6th Cir. 1998) (Clay, J., dissenting) (asserting that alleged racial slurs standing alone form the basis for an equal protection claim); *King*, 86 F. App'x at 814 (Moore, J., concurring). The "other prohibited behavior," beyond the use of a racial slur, must be supported by specific acts, practices, or policies which resulted in the alleged discrimination. *See Davey v.*

---

[2] The Court notes that the substance for this alleged "racial epithet" is solely based on Rodriguez's own statement that "the [inmate] trustees . . . and the jailers" called him "Sasquatch, I guess, because Mexicans hide behind trees like a Sasquatch does. They assumed I was Mexican." Nevertheless, the Court construes this term as defined by the plaintiff in viewing the facts in the light most favorable to the non-movant.

*Tomlinson*, 627 F. Supp. 1458, 1462 (E.D. Mich. 1986) (citing *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844 (4th Cir. 1979).

Here, Rodriguez alleges the use of a racial slur and alleges various instances of unconstitutional treatment, but the record does not support that he was treated differently because of his status as a Latino. Though Rodriguez does argue in his response to Defendants' motion for summary judgment that Mafnas offered cigarettes to inmates to "go into Mr. Rodriguez's cell and beat up 'Sasquatch,'" this term is conspicuously absent from Rodriguez's own deposition testimony about the incident. Instead, the term appears elsewhere in Rodriguez' deposition testimony when Rodriguez broadly claims that "the jailers," along with fellow detainees, referred to him by the term. The record reflects that Rodriguez was not the only Latino detainee in the JCDC that evening, yet there are no allegations that this racial slur, or any other, were used in reference to the other Latino detainee. Further, there is no evidence that the other Latino detainee was treated differently than any other detainee. A "person bringing an action under the Equal Protection Clause must show intentional discrimination against him because of his membership in a particular class, not merely that he was treated unfairly as an individual." *Davenport v. Simmons*, 192 F. Supp. 2d 812, 821 (W.D. Tenn. 2001) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999)). Consequently, Rodriguez's Equal Protection claims under § 1981 and §1983 fail as to all Defendants.

### 2. 42 U.S.C. § 1985

To succeed on a claim brought under 42 U.S.C. § 1985(3), "a plaintiff must prove (1) a conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege

of a citizen of the United States." *Moniz v. Cox*, 512 F. App'x 495, 499 (6th Cir. 2013) (quoting *Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994)). The plaintiff must also allege that the conspiracy "was motivated by racial, or other class-based, invidiously discriminatory animus." *Id.* (citing *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999)). Additionally, conspiracy claims must be pled with some degree of specificity and "vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987).

Summary judgment for all Defendants on this claim is warranted on three grounds. First, "when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Cunningham v. Tennessee Cancer Specialists*, 957 F.Supp.2d 899, 921 (E.D. Tenn. 2013). Rodriguez did not address Defendants' arguments against his § 1985 claims. Second, Rodriguez has not established a *racially-motivated* conspiracy. Instead, there is only a vague, conclusory assertion that "the jailers" called Rodriguez "Sasquatch" ten to fifteen times. Third, the only allegation of a *conspiracy* is the allegation that the individual defendants were "co-conspirator state actors." Such a conclusory statement, without factual support, is not adequate to state a cause of action. *See Jaco v. Bloechle*, 739 F.2d 239, 245 (6th Cir. 1984) (dismissing conspiracy claim where the complaint merely alleged broad conclusory language void of the factual allegations necessary to support a conspiracy theory); *see also Raudenbush v. Monroe Cty.*, Tennessee, No. 3:11-CV-00625, 2019 WL 1429533, at *8 (E.D. Tenn. Mar. 29, 2019). In short, Rodriguez does not sufficiently allege, and the record does not support, the existence of a racially-motivated conspiracy. Even if those two hurdles were cleared, Rodriguez waived the argument by failing to address it.

### 3. Conclusion

In short, Defendants' motion for summary judgment in regards to Count 2 will be granted as to all Defendants and the claim will be dismissed.

### C. Count 3 - Violation of 42 U.S.C. § 1983 – Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth, Eighth and Fourteenth Amendments against Jefferson County

Rodriguez has also brought a § 1983 claim against Jefferson County based on the same allegations under the Fourth, Eighth, and Fourteenth Amendments. However, damages cannot be awarded against a local governmental entity based on the actions of any of its officers if the officers inflicted no constitutional harm. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Johnson v. Lincoln Cty.*, No. 4:06-CV-22, 2008 WL 2697308, at *16 (E.D. Tenn. May 25, 2008). As the only alleged constitutional harms that survive are the claims against Mafnas for excessive force related to striking and choking Rodriguez while restrained, these are the only remaining claims for which Jefferson County could also have liability.

A municipality "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978). However, a local governmental unit may be liable for civil damages in a § 1983 action when the execution of a governmental policy or the toleration of a custom causes the deprivation of a constitutionally protected right. *Doe v. Claiborne Cty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell*, 436 U.S. at 691). A plaintiff can establish the existence of an illegal policy or custom by reference to "(1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

Here, Rodriguez attempts to establish his *Monell* claim against Jefferson County using the latter three methods; each will be addressed in turn.

### 1. Actions by Sheriff McCoig as an official with final decision-making authority

Rodriguez maintains that Jefferson County, by way of Sheriff McCoig as the final decision-making authority, is *a priori* liable for any constitutional violation as the "cause" of the violation. Seemingly, Rodriguez argues that, because Sheriff McCoig demoted Defendant Mafnas from a supervisor position for failing to carry out the duties of a supervisor but designated Mafnas as the "acting supervisor" on the date of Rodriguez's detention, Sheriff McCoig "caused" Rodriguez's alleged harms. First, the Court notes that Sheriff McCoig is not a party to this suit, so to the extent that Rodriguez is arguing that he is liable under a supervisor liability theory, that claim fails. Second, the record merely shows that Mafnas was previously removed as a supervisor for failing to carry out the duties of the supervisor role, not for a history of committing or permitting constitutional violations of detainees' rights. Third, this reductionist logic yields liability akin to that of *respondeat superior*, which was foreclosed by the Supreme Court. *Monell*, 436 U.S. at 694; *cf. Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 410 (1997) (holding that a municipality was not liable for its hiring decision where the employee later went on to use excessive force against plaintiff because the plaintiff failed to demonstrate that the municipality directly caused the injury through its own deliberate action).

To the extent that Rodriguez brings suit against Mafnas in his official capacity, he has not argued that Mafnas, then a sergeant, was a "policymaker" for his actions to impose liability on Jefferson County. *See, e.g.*, *Warner v. McMinn Cty., TN*, No. 1:04CV399, 2007 WL 3020510, at *17 (E.D. Tenn. Oct. 11, 2007) (finding no evidence presented to support that a sergeant was a "policymaker," so liability could not be imposed on the county). "Policymakers" are determined

by state law, *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005), and a deputy sheriff in Tennessee can be a policymaker. *Cagle v. Headley*, 148 F. App'x 442, 446 (6th Cir. 2005). But that determination is fact driven and there are no facts on the record to support that Defendant Mafnas was a policymaker in his official capacity. Consequently, this theory of municipality liability fails.

### 2. Custom of Tolerance

Rodriguez argues that Jefferson County has "created and tolerated an atmosphere of lawlessness" and maintains a "culture of indifference."

To prevail on a theory of inaction or acquiescence, a plaintiff must show: "(1) the existence of a clear and persistent pattern of [illegal activity]; (2) notice or constructive notice on the part of the [defendant]; (3) the [defendant's] tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the [defendant's] custom was the "moving force" or direct causal link in the constitutional deprivation." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Doe*, 103 F.3d at 508).

Here, this theory fails for multiple reasons. First, Rodriguez points only to the "pattern" of illegal activity that he has alleged as against himself, including the loss of the video footage of the alleged incidents. Rodriguez argues, based on the Eiser Report, that the JCDC had a "practice of ignoring the potentially serious medical and safety needs of Mr. Rodriguez." However, Rodriguez brings no evidence before the Court of any *prior* patterns of illegal activity in the JCDC. A conclusory assertion of a pattern solely as to Rodriguez does not establish the "clear and persistent pattern" contemplated by the standards for a theory of inaction claim. Second, because Rodriguez has not established any prior patterns of illegal activity, he has not established that

Jefferson County was on notice of any illegal activity. Third, Rodriguez has not established that Jefferson County tacitly approved of any unconstitutional conduct. Instead, Rodriguez concedes that Mafnas was demoted by Sheriff McCoig for striking Rodriguez in the ribs during the booking incident. Lastly, Rodriguez does not establish that any customs of Jefferson County were the *moving force* behind any unconstitutional conduct. Consequently, this theory of municipal liability also fails.

### 3. Inadequate Training and Supervision

Rodriguez also alleges that Jefferson County has a policy of inadequately training and supervising its officials so as to prevent the excessive use of force and other constitutional violations. This theory consists of three elements: (1) that the individual defendants' training or supervision was inadequate for the tasks that officers in their position must perform; (2) that the inadequacy persisted due to the County's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused the plaintiff's injury. *Harvey v. Campbell Cty., Tenn*., 453 F. App'x 557, 562 (6th Cir. 2011) (citing *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008)). To establish the second element, deliberate indifference, plaintiffs must either present evidence of prior instances of unconstitutional conduct demonstrating that the county had notice that the training was deficient and likely to cause injury, or evidence of a single violation of federal rights, accompanied by a showing that the county had failed to train its employees to handle recurring situations presenting an obvious potential for such a violation. *Id.* As Rodriguez has presented no evidence of a prior history of unconstitutional conduct to put Jefferson County on notice, he relies upon the second method of establishing deliberate indifference.

Here, Rodriguez has not presented any evidence of deficient training or supervision beyond the mere presumption that greater training or supervision would have prevented the alleged

incidents giving rise to Rodriguez's claims. While there is evidence on the record, primarily the Eiser Report, that the individual Defendants may not have adhered to the letter of JCDC policy or "jail industry standards," there is no evidence that any laxity was the product of deficiency in training or supervision. Even if there was evidence to that end, there is no evidence that such an inadequacy "*persisted* due to the County's deliberate indifference." *Harvey*, 453 F. App'x at 562 (emphasis added). Consequently, this theory of municipal liability also fails.

In sum, because Plaintiff has not presented evidence that establishes municipal liability on any of its three alleged bases, Count 3 will be dismissed.

### D.  Count 4 – Intentional & Negligent Infliction of Emotional Distress

Rodriguez also brought claims of intentional infliction of emotional distress against all individual Defendants and negligent infliction of emotional distress against Jefferson County and all Defendants. In his response, Rodriguez appears to narrow the claim of intentional infliction of emotional distress only to Mafnas and brings the claim of negligent infliction of emotional distress against Jefferson County, Mafnas, White, Underwood (who has never been a party in this suit), and Shults. Each claim will be addressed in turn.

#### 1.  Intentional Infliction of Emotional Distress

Rodriguez has alleged two actions that form the basis of the claim: (1) Mafnas repeatedly struck him in the back around his ribs after he had been taken down for pushing a computer monitor off of a desk, and (2) Mafnas choked Rodriguez while he was restrained in a restraint chair following the incident. As a result, Rodriguez claims he has suffered weight loss, sleeplessness, depression, anxiety, crying spells, humiliation, embarrassment, anger, worry, and has had to seek counselling.

To succeed on an IIED claim, the plaintiff must show by competent evidence that the defendant's conduct was "(1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012). When determining whether conduct is "outrageous," Tennessee courts have adopted the high standard set forth in the Restatement (Second) of Torts:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

*Bain v. Wells*, 936 S.W.2d 618, 623 (Tenn. 1997) (*citing* RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)); s*ee also MacDermid v. Discover Fin. Servs.*, 488 F.3d 721, 732 (6th Cir. 2007) ("Tennessee's outrageous conduct standard . . . is a formidable one.").

A serious mental injury may be shown by evidence of several nonexclusive factors, including depression, crying spells, nightmares, weight loss, and more. *See Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 209 (Tenn. 2012). Such evidence may be presented by a plaintiff's "own testimony, the testimony of lay witnesses acquainted with the plaintiff such as family, friends, and colleagues, or by the testimony of medical experts." *Id.* at 210.

Here, Rodriguez has presented an affidavit that he has experienced "nightmares, depression, weight loss, crying spells, and other emotional distress" since he was allegedly struck in the ribs by Defendant Mafnas and choked while in the restraint chair. While this evidence is sparse, it would be evidence sufficient to create a question of fact better resolved by the jury.

However, Mafnas' alleged conduct, though unprofessional and reprehensible, simply does not meet the high standard for outrageous conduct. Outrageous conduct is "so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." The Court certainly condemns such behavior, but does not find that the evidence supports a finding that Mafnas' alleged conduct, either striking Rodriguez in the ribs or choking him while in the restraint chair, rise to the level of "outrageous" conduct contemplated by Tennessee law. *See, e.g.*, *Jones v. Muskegon Cty.*, 625 F.3d 935, 948 (6th Cir. 2010) ("The recitation of these facts alone would not arouse the resentment of a reasonable juror . . . such that he would exclaim, "outrageous!""); *Stafford v. Jackson Cty.*, No. M201601883COAR3CV, 2017 WL 3332268, at *7 (Tenn. Ct. App. Aug. 4, 2017) (finding that possible use of excessive force that caused a torn rotator cuff did "not rise to the level of such outrageous and extreme conduct as to go beyond all bounds of decency.").

### 2. Negligent Infliction of Emotional Distress

Rodriguez brings this claim against Jefferson County, Mafnas, White, and Shults for failing to prevent the alleged sexual assault by other inmates and for failing to prevent Mafnas from using excessive force.

The elements of a claim for negligent infliction of emotional distress include: (1) duty, (2) breach, (3) causation (both factual and proximate), (4) damages, and (5) a serious or severe emotional injury. *Rogers*, 367 S.W.3d at 206 (citation omitted).

Here, Jefferson County cannot be sued for this type of claim. *See* Tenn. Code Ann. § 29-20-205(2); *see, e.g.*, *Crowley v. Anderson Cty., Tennessee*, No. 3:17-CV-169, 2018 WL 8919930, at *9 (E.D. Tenn. Feb. 15, 2018). As for any individual liability for failing to prevent the alleged assault by fellow inmates, Rodriguez has not presented any evidence that any of the individual

Defendants breached any duty to Rodriguez beyond his own testimony that inmates assaulted him. Further there is no evidence that any possible breach was the factual or proximate cause of the assault. In contrast, the record shows that White intervened at some point after hearing calls for help and brought Rodriguez into the booking area.

As for any individual liability for failing to prevent or cease Mafnas' alleged excessive use of force, "a correctional officer has a duty to protect an inmate from assaults by fellow officers." *Rose v. Sevier Cty., Tenn.*, 2012 WL 6141000, at *4 (E.D. Tenn. Dec. 11, 2012) (Phillips, J.) (citing *McHenry*). However, Rodriguez presents no evidence that Shults or White breached that duty. Further still, even if they breached a duty, Rodriguez presents no evidence that such a breach was a factual or proximate cause of his alleged damages. Likewise, as such a claim against Mafnas is duplicative of the IIED claim against him, which has already failed, this basis for an NIED claim against Mafnas likewise fails.

In sum, Rodriguez has not presented evidence to support either of his claims of infliction of emotional distress, and Count 4 will be dismissed.

### E. Counts 5 & 6 – Assault & Battery

Rodriguez has brought state law claims of assault and battery against the individual Defendants.

In Tennessee, an assault is defined as "any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against that person." *Thompson v. Williamson Cty., Tenn.*, 965 F. Supp. 1026, 1037 (M.D. Tenn. 1997); *Huffman v. State*, 292 S.W. 2d 738, 742 (1956). A battery is defined as "any intentional, unlawful and harmful (or offensive) contact by one person with the person of another." *Raines v. Shoney's, Inc.*, 909 F. Supp. 1070, 1083 (E.D. Tenn. 1995). Under

Tennessee law, "there cannot be an assault and battery without a willful injury of the person upon whom the wrong is inflicted." *Thompson*, 965 F. Supp. at 1038.

However, when a plaintiff raises an assault and battery claims under Tennessee law arising from the same uses of force that form his §1983 excessive-force claim, the analysis is one and the same. *See Griffin v. Hardrick*, 604 F.3d 949, 956 (6th Cir. 2010); *see also Harris v. Metro. Gov't of Nashville*, No. 3:06–0868, 2007 WL 4481176, at *9 (M.D. Tenn. Dec.18, 2007) ("Tennessee courts apply the same 'excessive force' principles to assault and battery claims against police officers.").

Here, Rodriguez's excessive-force claims against Shults and White have already failed, so any assault or battery claims against them must also fail. However, since Rodriguez's excessive-force claims against Mafnas for striking him in the ribs and for choking him in the restraint chair may proceed, the assault and battery claims against Mafnas may also proceed.

### F. Counts 7, 8 & 9 – Malicious Harassment, Negligence, and False Imprisonment

Rodriguez also brought claims of malicious harassment, negligence, and false imprisonment under Tennessee state law against Defendants. Defendants argues that these claims are inapplicable to any defendant in their official capacity under Tenn. Code Ann. § 29-20-205 and inapplicable to any defendant in their individual capacity under the undisputed material facts.

As to malicious harassment, Defendants argue that Rodriguez has not presented evidence that any action by an individual defendant was motivated by ill-will, hatred, or spite due to Rodriguez's race, color, religion, ancestry, or national origin. To prevail in a malicious harassment claim, a plaintiff must establish "that (1) a person acted maliciously to (2) unlawfully intimidate another from the free exercise or enjoyment of a constitutional right by (3) injuring or threatening to injure or coercing another person." *Wright v. Penguin Random House*, No. 18-6323, 2019 WL

3945632, at *4 (6th Cir. Aug. 21, 2019) (citing *Washington v. Robertson County*, 29 S.W.3d 466, 473 (Tenn. 2000)).  In his response, Rodriguez does not address Defendants' arguments regarding the malicious harassment claim.

Nevertheless, Rodriguez does assert that the racial slur "sasquatch" was used repeatedly during Rodriguez's incarceration by the individual defendants and that Defendant Mafnas offered cigarettes to two fellow inmates "if they would go to [Rodriguez's] cell and beat up 'sasquatch.'" But Rodriguez's actual account of the specific alleged cigarettes-for-assault *quid pro quo* is strikingly devoid of any reference to his race, color, or ethnicity or the racial slur asserted.  Instead, Rodriguez generally accuses Defendants and inmates of using the racial slur in a separate portion of the record.  Rodriguez has not addressed Defendants' argument with regards to the malicious harassment claim, and the record, even when viewed favorably towards Rodriguez, does not support the claim.

As to negligence and false imprisonment, it is well understood "that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Cunningham v. Tennessee Cancer Specialists*, 957 F.Supp.2d 899, 921 (E.D. Tenn. 2013).  Rodriguez has raised no opposition to Defendants' motion on these grounds.

Consequently, because Rodriguez does not address Defendants' arguments regarding malicious harassment, negligence, and false imprisonment, Defendants' motion for summary judgment as to malicious harassment, negligence, and false imprisonment is granted.

## IV.    Stay of the Case and Mediation

This Order has a large impact on the landscape of this case in light of the trial currently scheduled for November 19, 2019.  Upon a careful review of the record, the Court concludes that

mediation will facilitate a possible resolution in this case. Consequently, pursuant to Local Rule 16.4, this case will be stayed pending the conclusion of mediation and the parties will be directed to mediation.

## V. Conclusion

Based on the foregoing, Defendants' joint motion for summary judgment [D. 72] is **GRANTED in part** and **DENIED in part**, as follows:

- Rodriguez's § 1983 claims (Count 1) against Shults and White are **DISMISSED with prejudice**;

- Rodriguez's claims under §§ 1981, 1983, and 1985 (Count 2) are **DISMISSED with prejudice**;

- Rodriguez's *Monell* claim (Count 3) against Jefferson County is **DISMISSED with prejudice**;

- Rodriguez's state-law claims for intentional and negligent infliction of emotion distress (Count 4), malicious harassment (Count 7), negligence (Count 8), and false imprisonment (Count 9) are **DISMISSED with prejudice**;

- Rodriguez's state-law claims for assault and battery (Counts 5 and 6) are against Shults and White are **DISMISSED with prejudice**;

Because all claims against Jefferson County, Tennessee, have been dismissed, Jefferson County is hereby **DISMISSED** as a defendant in this case. Because all claims against Ryan Payne, Brian Shults, and Brandon White have been dismissed, Payne, Shults, and White are hereby **DISMISSED** as defendants in this case.

Further, the trial date set for November 19, 2019 is **CANCELLED** and this case is **STAYED in its entirety** pending further order of the Court. The parties are **ORDERED** to schedule mediation within 45 days. The parties are further **ORDERED** to file a joint status report regarding the outcome of mediation within ten days of the date of the mediation.

Should mediation fail to bring about a resolution, Rodriguez may proceed to trial on his § 1983 excessive-force claims, assault claims, and battery claims against Eddie Mafnas.

**IT IS SO ORDERED.**

_____

**CHIEF UNITED STATES DISTRICT JUDGE**